UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROMEO MORRIS,

                              Plaintiff,

-v-

THE CITY OF NEW YORK, P.O. JONATHAN PEREZ, and P.O.s JOHN DOES #1-50, individually and in their official capacity,

                              Defendants.

15-CV-3121 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiff Romeo Morris brings this action pursuant to 42 U.S.C. § 1983 against the City of New York ("the City") and Officer Jonathan Perez of the New York City Police Department ("NYPD"). Morris claims that he was falsely arrested, subjected to excessive force, and maliciously prosecuted for an alleged robbery. Defendants now move for summary judgment. For the reasons that follow, that motion is granted.

**I. Background**

    **A. Factual Background**

The following facts are undisputed unless otherwise noted, and are based on the parties' Rule 56.1 statements of material facts. (*See* Dkt. Nos. 25, 31, 37.)

On the night of September 1, 2014, Sergeant Gregg Bagonyi and Detective Dennis Lopez were driving in their NYPD patrol car in upper Manhattan. (Dkt. No. 25 ¶ 12.) They were flagged down near Lexington Avenue and 108th Street. (*Id.*) At about the same time, a call came over the radio regarding a robbery that had just taken place in that vicinity. (*Id.*)

After stopping, Lopez and Bagonyi spoke with Isaiah Domingues, who informed the officers that he had just been punched in the face and robbed of a gold necklace. (*Id.* ¶ 13; Dkt.

No. 31 ¶¶ 13, 43.) The officers also spoke to Luis Saloj, who had witnessed the robbery. (Dkt. No. 25 ¶ 13.) Domingues and Saloj described the suspects as black men (though the parties dispute whether they said there were two or three individuals), one of them carrying a gun, who fled in a dark-colored vehicle. (*Id.* ¶ 14; Dkt. No. 31 ¶¶ 14, 43.) Domingues and Saloj also handed the officers a piece of paper given to them by a passing cab driver who had seen the altercation and had written down the plate number of the vehicle in which the assailants fled. (Dkt. No. 31 ¶¶ 15–16.) The vehicle bearing that license plate number, a dark blue 2014 Jeep Cherokee, belonged to Arlene Holmes, who was then the girlfriend of Romeo Morris, the plaintiff in this case. (Dkt. No. 25 ¶¶ 4, 17.)

After Lopez and Bagonyi relayed the license plate number over the radio, an NYPD dispatcher broadcast a notice that two black males had fled southbound on Lexington Avenue, that a "chain was taken from the victim," and that one suspect had a gun. (*Id.* ¶ 18.)

Shortly thereafter, the Jeep Cherokee, driven by Morris, was pulled over by two NYPD officers in the vicinity of 146th Street and Broadway for making an illegal U-turn. (*Id.* ¶¶ 21–23.) There were two other men with Morris in the Jeep. (Dkt. No. 31 at ¶ 21.) The parties agree that Morris had made an illegal U-turn before being pulled over, but the parties also appear to agree that the officers who stopped him knew that the Jeep was connected to a robbery that had just taken place. (*Id.*; Dkt. No. 31 ¶¶ 22–23; Dkt. No. 26 at 4.) When asked whether he knew that he had just made an illegal turn, Morris answered "yes." (Dkt. No. 25 ¶ 23.)[1]

A large contingent of NYPD officers soon descended on the scene. (Dkt. No. 25 ¶ 25; Dkt. No. 37 ¶ 48.) Morris and his two companions were removed from the Jeep at gunpoint.

---

[1] Morris was also driving with a suspended license at the time, but it is unclear whether this was known to the officers at the time of the stop. (*See* Dkt. No. 25 ¶ 23 n.5; Dkt. No. 31 ¶ 23 n.5.)

2

(Dkt. No. 37 at ¶ 49.) A short while later, Perez and his partner, Officer Tyler Conner, arrived at the scene with Domingues to perform a "show up" identification of the suspects. (Dkt. No. 25 ¶ 29.) Domingues identified Morris's two companions as the men who robbed him. (*Id.* ¶ 31.) Morris and his two companions were arrested. (*Id.* ¶ 32.) A search of the vehicle turned up a gold chain (Dkt. No. 25 ¶ 33), though Morris asserts that three chains were found, two of which were gold (Dkt. No. 31 ¶ 33).

While the police searched the Jeep, an officer—Morris claims it was Perez's partner, Officer Conner—ordered Morris to sit on the curb. (Dkt. No. 37 at ¶ 50.) When Morris responded that a childhood pelvic injury prevented him from sitting down on his own, the officer helped Morris lower himself to the ground. (*Id.* ¶¶ 50–51.) As Morris was being lowered to the ground, a second officer—Morris claims it was Perez, which Defendants dispute—kicked Morris to the ground. Defendants do not dispute that the kick caused Morris to collapse on his right hand and break his pinky finger. (*Id.* ¶ 51.) The pain caused Morris to clench his fist in pain, and the second officer, seeing the closed palm, asked Morris "what do you got in [there]," and ground the injured hand with his boot. (*Id.* ¶ 52.)

The next day, September 2, 2014, The New York County District Attorney's Office filed a criminal complaint against Morris and his companions. (Dkt. No. 25 ¶ 34 (citing Dkt. No. 24-31).) Each was charged with one count of first degree robbery and two counts of second degree robbery. (*Id.* ¶ 35 (citing Dkt. No. 24-31).) However, a grand jury voted "no true bill" as to the charges against Morris and the criminal case against him was closed. (*Id.* ¶ 40.)

B. **Procedural History**

Morris initiated this action on April 21, 2015 (Dkt. No. 1), and filed an amended complaint (the "Complaint") on May 5, 2015 (Dkt. No. 6). The Complaint asserts the following

3

claims: (1) a § 1983 claim for deprivation of civil rights; (2) a § 1985 claim for conspiracy to deprive Morris of his civil rights; (3) a § 1983 claim for false arrest and false imprisonment; (4) a § 1983 claim for malicious prosecution; (5) a § 1983 claim for assault; (6) a state law claim against the City for negligent hiring and retention; (7) a § 1983 claim for excessive force; and (8) a municipal liability claim against the City. Defendants answered on July 14, 2015. (Dkt. No. 8.) Defendants moved for summary judgment on January 18, 2017. (Dkt. No. 23.)

II.     **Legal Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014). The court views all evidence "in the light most favorable to the non-moving party" and summary judgment may be granted only if "'no reasonable trier of fact could find in favor of

4

the nonmoving party.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (quoting *Lunds, Inc. v. Chemical Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

**III. Discussion**

Morris's claims fall into three categories: (1) claims relating to the circumstances of his arrest, (2) claims relating to the prosecution of his case, and (3) claims relating to the alleged use of force during the arrest. The court discusses each in turn.

**A. False Arrest Claims**

The first category of Morris's claims relates to the circumstances of his arrest. Specifically, Morris argues that there was no probable cause to arrest him for the alleged robbery, and therefore the arrest violated his Fourth Amendment rights, a violation made actionable through 42 U.S.C. § 1983. (*See* Dkt. No. 6 ¶¶ 34–37.)

To succeed on a claim under § 1983, a plaintiff must demonstrate that a state actor violated his federally protected rights. *West v. Atkins*, 487 U.S. 42, 48 (1988). The elements of a false arrest claim under § 1983 depend on the law of the state in which the arrest occurred—here, New York. *Jaegly v. Couch*, 439 F.3d 149, 151–52 (2d Cir. 2006) (citing *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). "To establish a false arrest claim under New York law, a plaintiff must demonstrate that he was intentionally confined by the defendant without his consent and without justification." *Brown v. City of New York*, 306 F. Supp. 2d 473, 479 (S.D.N.Y. 2004).

**1. Qualified Immunity**

They key issue on the false arrest claim is whether Perez is entitled to qualified immunity. "An officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he had arguable probable cause to arrest the plaintiff for any offense,

regardless of the offense with which the plaintiff was actually charged." *Kass v. City of New York*, No. 15 Civ. 2053, 2017 WL 3122289, at *3–4 (2d Cir. July 24, 2017) (collecting cases). "Probable cause exists when 'the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012) (alterations in original) (quoting *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)) (internal quotation marks omitted). Arguable probable cause exists when "it was objectively reasonable for the officer to believe that probable cause existed, or . . . officers of reasonable competence could disagree on whether the probable cause test was met." *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016).

"[S]ummary judgment on the basis of qualified immunity will be appropriate 'when the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest.'" *Mesa v. City of New York*, No. 09 Civ. 10464, 2013 WL 31002, at *7 (S.D.N.Y. Jan. 3, 2013) (quoting *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997). Additionally, "[q]ualified immunity is an affirmative defense. The burden rests on the defendants to raise the defense in their answer and to establish the defense on a motion for summary judgment or at trial." *Lee v. Sandberg*, 136 F.3d 94, 101 (2d Cir. 1997).

## 2. Probable Cause to Arrest

Defendants argue that Perez is entitled to qualified immunity because there was probable cause or, at least, arguable probable cause to arrest Morris.[2] Three key facts go toward probable cause and are not disputed: First, the license plate of Morris's Jeep matched the plate number taken down by the cab driver a short while earlier. (Dkt. No. 31 ¶ 15; Dkt. No. 37 ¶¶ 46–47.) Second, the description of the vehicle—a dark colored jeep or van—matched the description given by Domingues (the victim) and Saloj (the witness). (Dkt. No. 31 ¶¶ 4, 14–17.) And third, Domingues positively identified Morris's two companions as the people who robbed him. (*Id.* ¶ 31.)[3]

Morris makes several arguments that these three facts do not constitute probable cause. First, he argues that the license plate number provided by the cab driver was an uncorroborated anonymous tip, and is therefore insufficient to constitute probable cause. (Dkt. No. 32 at 3–6.) Morris suggests that "[f]or all Perez and his colleagues knew, the cabbie could have come upon the scene after the assailant's getaway and, seeing [Morris] pull away from the curb, mistaken [Morris's] vehicle for the muggers." (*Id.* at 5.)

This argument is unconvincing. The governing standard for anonymous tips is the "totality of the circumstances" approach set forth in *Illinois v. Gates*, 462 U.S. 213 (1983). *See also Alabama v. White*, 496 U.S. 325, 328–29 (1990). Among the relevant factors, *Gates* held,

---

[2] Morris's false arrest claim requires the Court to decide only whether there was *arguable* probable cause. However, since Morris's malicious prosecution claim requires the Court to decide whether there was actual probable cause that he committed a crime, as discussed below, the Court analyzes the arrest using the more demanding probable cause standard.

[3] Defendants proffer additional evidence to support a finding of probable cause, but those facts are disputed in whole or in part. These include the fact that the traffic stop preceding Morris's arrest was due to a traffic violation, that Morris was driving with a suspended license, and that the police found a torn shirt collar and bloody T-shirt inside the Jeep.

are the informant's veracity, reliability, and basis of knowledge. *Gates*, 462 U.S. at 230. "[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness," who reasonably appears to be telling the truth. *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)).

In this case, there were sufficient indicia of reliability. The cab driver claimed to have firsthand knowledge of the information he provided, and there was no reason to doubt that Domingues, Saloj, and the cab driver were telling the truth about the assailants and the getaway car. "[I]t is clear that the identification of an individual as the perpetrator of a crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is telling the truth." *Rodriguez v. New York*, No. 95 Civ. 3639, 1996 WL 197749, at *2 (S.D.N.Y. Apr. 23, 1996); *see also Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ("[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information.").

Most importantly, at the time of arrest, the cab driver's tip was corroborated by the victim's positive identification of Morris's companions. An officer may rely on an informant's tip "so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Gates*, 462 U.S. at 242 (quoting *Jones v. United States*, 362 U.S. 257, 269 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980)) (internal quotation mark omitted). While the cab driver's tip may not have by itself sufficed to create probable cause, *see United States v. Elmore*, 482 F.3d 172, 181 (2d Cir. 2007) ("Where the informant is completely anonymous . . . a significant amount of corroboration will be required."),

8

the Court concludes that there was sufficient corroboration and that the police justifiably relied on the cab driver's tip in their decision to arrest Morris.

Morris next focuses on several "discrepancies" among the reports by the victim, witness, and cab driver and the information gleaned by the police during the traffic stop. (Dkt. No. 32 at 5–9.) Specifically, Morris highlights that (1) while the victim may have reported there being two assailants, there were three people in Morris's Jeep; (2) while some reports indicated that the vehicle was fleeing southbound from the crime scene, Morris's Jeep was heading northbound when it was stopped; (3) while some reports listed the vehicle as black, Morris's Jeep was dark blue; and (4) while the victim stated that one of his assailants had a gun, no gun was found in Morris's Jeep or on its occupants. (*See id.*)

Here, too, the Court concludes that these alleged discrepancies do not create a genuine issue of material fact sufficient to defeat summary judgment on the issue of probable cause. Even if the initial report stated that there were only two African-American assailants, its veracity is not undermined if those two are apprehended in a vehicle containing three African-American individuals. Along the same vein, the initial report that the getaway car headed southbound on Lexington Avenue—a one-way street—is not contradicted by the fact that Morris was apprehended heading northbound on Broadway. The result is the same for the fact that the initial report—given at night—described the getaway vehicle as black, while Morris's Jeep was dark blue. *See Ward v. City of New York*, No. 96 Civ. 9411, 1998 WL 830620, at *4 (S.D.N.Y. Dec. 1, 1998) ("The differing reports of the car's color is not a problem. It is hard to distinguish, at night, among dark colors such as black, blue and grey.") Even the discrepancy between the initial report—which stated that one of the assailants had a gun—and the fact that no weapon was found in Morris's Jeep does not negate a finding of probable cause because a reasonable

9

officer might have concluded that the suspects rid themselves of the gun after the crime. *See United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts alleged, however, does not negate probable cause.").

The Court therefore concludes that the above three facts constitute probable cause for the traffic stop and arrest. The parties dispute why the vehicle was stopped—Defendants state it was because of an illegal U-turn, while Morris notes that it was because the officers in question identified the Jeep as the one allegedly connected to the robbery. (Dkt. No. 31 ¶ 22.) Nevertheless, once stopped, the matching description of the getaway vehicle, the matching license plate, and the positive identification by the victim of Morris's two companions warranted "the belief that an offense has been or is being committed by the person to be arrested." *Marcavage*, 689 F.3d at 109 (quoting *Dunaway*, 442 U.S. at 208 n.9) (internal quotation marks omitted).

These facts give rise to arguable probable cause as "it was objectively reasonable for the officer to believe that probable cause existed," or, at the very least, "officers of reasonable competence could disagree on whether the probable cause test was met." *Myers*, 819 F.3d at 633. This conclusion is further bolstered by the fact that the traffic stop took place shortly after the alleged robbery, when the information conveyed by the cab driver and by the police dispatcher was still fresh. *See Ward*, 1998 WL 830620, at *4 (concluding that there was probable cause based in part on "the proximity of the stopped car to the scene of the incident, the timing of the [traffic] stop in relation to the robbery, and the fact that [suspects matching the description reported by the victim] were observed in the stopped car").

"Probable cause is, of course, evaluated on the totality of the circumstances." *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007). Looking at the totality of the circumstances,

and despite the discrepancies pointed out by Morris, the Court concludes that there was probable cause—or, at the very least, arguable probable cause—to arrest Morris. And since "a municipality cannot be found liable for causing a constitutional violation where none occurred," *Ward*, 1998 WL 830620, at *5, the existence of probable cause is fatal to Morris's claim against the City as well. Accordingly, Defendants are entitled to summary judgment on the false arrest claim.

### B. Malicious Prosecution Claim

Morris's second claim is that he was maliciously prosecuted for a crime he did not commit. "To establish New York state and § 1983 claims of malicious prosecution, a plaintiff must allege the following elements: (1) institution or continuation of a criminal proceeding by the defendant against the plaintiff; (2) termination of such proceeding in the plaintiff's favor; (3) malice in commencing the proceeding; and (4) lack of probable cause for the proceeding." *Brome v. City of New York*, No. 02 Civ. 7184, 2004 WL 502645, at *5 (S.D.N.Y. Mar. 15, 2004) (quoting *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir. 2003)).

The first and second requirements are not disputed, as there were criminal charges filed against Morris (*see* Dkt. No. 24-31), and the grand jury voted "no true bill" as to the charges against Morris. (Dkt. No. 25 ¶ 40.) Defendants, however, argue that there is no evidence of malice on the part of Perez and that there was probable cause for filing charges against Morris. (Dkt. No. 26 at 6–8.)

#### 1. Malice

"Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth v. Town of*

*Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03 (1978)). "In most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Id.* (quoting *Conkey v. State*, 74 A.D.2d 998, 999 (N.Y. App. Div. 4th Dep't 1980)).

In his opposition brief, Morris does not point to any evidence of malice. (*See* Dkt. No. 32 at 10.) Morris's only evidence arguably going to malice is that Perez "consulted with prosecutors about the case," "executed the felony complaint," and "testified in the grand jury." (*Id.*) This is not enough. Although the lack of probable cause can itself be evidence of malice, "[i]n this case, however, the inferential leap from a lack of probable cause to a lack of belief in the guilt of the accused, much less to malice, would be improper," because "[t]here is no evidence that [the police officers] did not believe [defendant] was guilty of [the crime charged]." *Pinter v. City of New York*, 976 F. Supp. 2d 539, 559 (S.D.N.Y. 2013).

### 2. Probable Cause

In any event, the Court's conclusion that there was probable cause to arrest likewise applies to the institution of criminal proceedings, and "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino*, 331 F.3d at 72.

"The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases," *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013), because "[i]n the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'"

*Rounseville v. Zahl*, 13 F.3d 625, 629–30 (2d Cir. 1994) (quoting *Pandolfo v. U.A. Cable Sys. of Watertown*, 171 A.D.2d 1013, 1013 (N.Y. App. Div. 4th Dep't 1991)).

Because the Court has already concluded that there was probable cause to arrest Morris, he can prevail on his malicious prosecution claim only if he shows that "the discovery of some intervening fact made the probable cause 'dissipate' between the time of the arrest and the commencement of the prosecution." *Keith v. City of New York*, No. 11 Civ. 3577, 2014 WL 6750211, at *19 (S.D.N.Y. Dec. 1, 2014), *aff'd*, 641 F. App'x 63 (2d Cir. 2016). "In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth*, 82 F.3d at 571.

Morris adduces no evidence of dissipation. The only evidence arguably going toward dissipation are the inconsistencies regarding the color of the Jeep, the number of occupants, the traveling direction, and the lack of a weapon, all of which fail to negate probable cause, as explained above. Particularly important are the positive identification of Morris's two companions by the victim and the license plate tip from the cab driver, which was corroborated by the positive identification. *See Rodriguez*, 1996 WL 197749, at *2. Moreover, at this juncture, there was additional evidence to support probable cause: the fact that a search of Morris's Jeep turned up a gold necklace.[4] While Morris disputes the number of necklaces found in the Jeep, the fact that a necklace matching the description of the one taken from the victim was found in the Jeep adds to the evidence going to probable cause.

---

[4] These items were not considered by the Court in determining whether there was probable cause to arrest because the parties dispute whether the search took place before or after the arrest. At the time charges were filed, however, the evidence found during the search was part of the probable cause calculus.

13

Accordingly, the Court concludes that Morris has not adduced any evidence of malice, and that, alternatively, there was probable cause to file charges against him. As a result, Defendants are entitled to summary judgment on the malicious prosecution claim.

### C. Use of Force

Morris's final category of claims concerns the injury he suffered when he was arrested. Morris claims that Perez kicked the back of his ankle as another officer was lowering him to the ground. (*See* Dkt. No. 37 at ¶¶ 50–52.) Defendants do not dispute Morris's deposition testimony that he was kicked, or that the incident caused him to collapse on his right hand and break his pinky finger, but argue that it was not Perez who kicked him. (*Id.* ¶ 51.) Nor do Defendants dispute Morris's deposition testimony that the pain caused him to clench his fist in pain, and that the same officer who kicked him, seeing the closed palm, asked Morris "what do you got in [there]," and ground the injured hand with his boot. (*Id.* ¶ 52.) Defendants, however, again dispute Morris's contention that it was Perez. The parties also dispute whether Morris requested medical attention. Morris states that he requested medical treatment on several occasions but was not provided any, while Perez testified at his deposition that "nobody requested any medical attention." (*Id.* ¶ 56.)

"Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "A police officer is personally

14

involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd sub nom*. *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). "Even if a jury were to conclude that the police officers' collective use of force was objectively unreasonable, [plaintiff] still would have to prove that [defendant police officer] was personally involved in order to recover damages against him for the use of excessive force." *Thompson v. Tracy*, No. 00 Civ. 8360, 2008 WL 190449, at *6 (S.D.N.Y. Jan. 17, 2008).

The sticking point here is the issue of personal involvement by Perez. Defendants argue that Perez was not personally involved in the incident, and that Morris has not adduced any evidence to create a triable issue as to whether he was. (*See* Dkt. No. 26 at 8–11; Dkt. No. 36 at 6–7.) Defendants contend that "[w]hile Officer Perez was on the scene of the arrest, he was with the complaining victim conducting the 'show up' identification, and was not the one that arrested [Morris]." (Dkt. No. 26 at 10.) Moreover, Defendants argue, "[w]hile defendant Perez is plaintiff's arresting officer, his actions amounted to completing the complaint report and the arrest paperwork relating to the arrest." (*Id.*) During his deposition, Perez likewise denied taking part in the arrest. (*See id.* (citing Dkt. No. 24-25 to -26).)

In response, Morris argues that there is sufficient circumstantial evidence implicating Perez to justify sending the issue to a jury. (*See* Dkt. No. 32 at 11–12.) Morris's argument rests on his physical description of the offending officer and his partner. Morris testified at his deposition that the officer who kicked him was a "stocky" Hispanic man, which matches Perez's description. (Dkt. No. 24-10 at 124:1–9.) Two of Perez's colleagues, in their depositions, likewise described Perez as "Hispanic," "heavyset," and "stocky." (Dkt. No. 24-22 at 19:4–12; Dkt. No. 24-23 at 18:18–19). Morris also testified at his deposition that the officer who lowered him to the ground was a blue-eyed

15

Caucasian man, which matches the description of Perez's partner, Officer Tyler Conner. (Dkt. No. 24-9 at 119:21–120:2.) Perez, in his deposition, likewise described Conner as white with blue eyes. (Dkt. No. 24-25 at 39:17–40:7.)

Morris also points to the uncontested fact that Perez is listed as the arresting officer on Morris's arrest records. (*See, e.g.*, Dkt. No. 24-31.) Perez's log book for September 1, 2014 also contains an entry for 11:04 p.m. reading "3 under[,] taken by PO Perez." (Dkt. No. 33.) Accordingly, Morris argues that "Perez's personal liability comes down to whether the jury, weighing Plaintiff's trial and deposition testimony implicating Perez against the officer's testimony denying responsibility, concludes that Perez was in fact the officer who perpetrated the attack." (Dkt. No. 32 at 11.)

Morris, however, has not met his burden to adduce evidence that would allow a reasonable juror to conclude that Perez was personally involved. Once Perez denied personal involvement in his deposition, Morris was required to respond with evidence of his own. *See Husbands v. City of New York*, No. 05 Civ. 9252, 2007 WL 2454106, at *11 (S.D.N.Y. Aug. 16, 2007) (holding that officer's denial that he kicked plaintiff constituted an assertion of no personal involvement, requiring a response from plaintiff). Morris's countering evidence boils down to this: (1) the officer who kicked him is a stocky Hispanic man, as is Perez, (2) the officer who was lowering him to the ground was a blue-eyed white man, as is Perez's partner, (3) Perez was among the officers at the scene of the arrest, and (4) Perez is listed as his arresting officer.

But, by Morris's own account, there were about 20 or 30 police cars and over 100 officers present at the scene of arrest. (Dkt. No. 24-8 at 103:21–104:4; Dkt. No. 24-19 at 20:17–23.) In this context, Morris needs to adduce more evidence beyond the fact that Morris is a stocky Hispanic man to allow a reasonable juror to conclude that Perez was the officer who kicked him. While circumstantial evidence—including evidence about ethnicity and body

16

type—might constitute evidence of identity, the descriptions "stocky" and "Hispanic" are too vague to constitute a positive identification out of a crowd of 100 police officers, as are "Caucasian" and "blue-eyed." *See Munoz v. Martinez*, No. 03 Civ. 0828, 2005 WL 1355094, at *4 (S.D.N.Y. June 8, 2005) (granting summary judgment where plaintiff was unable to identify the individual corrections officers who assaulted him because he "did not offer any evidence opposing [defendant's] version of events" and "it seems that the only reason that [plaintiff] named [defendant] in the complaint is because [defendant's] name was listed on the Notice of Infraction").

Morris's circumstantial evidence is further undermined by the fact that Morris, in his deposition, wavered on the description of the officer who kicked him, describing him as "I want to say Dominican, he looks Dominican with like an Indian, Black, Dominican. I want to say he was Spanish, definitely Spanish, definitely a Spanish guy from the way his hair was and his skin complexion. He was like a little bit lighter than me, so I figured he was either Cuban or Black or Dominican or something like that." (Dkt. No. 24-10 at 124:1–9.) Likewise, Morris's description of Officer Conner is undermined by the fact that Morris described Conner as "about my height" (Dkt. No. 24-9 at 119:23), but, while Morris testified that he is 6'4" tall (Dkt. No 24-1 at 13:10), three deposition witnesses described Conner as between 5'6" and 5'11" tall. (Dkt. No. 24-22 at 17:25; Dkt. No. 24-23 at 17:12–13; Dkt. No. 24-25 at 39:24.)

Crucially, Morris's opposition brief does not point to a statement or affidavit by Morris specifically identifying Perez as the officer who kicked him.[5] Morris's attorney had ample

---

[5] The closest Morris comes to identifying Perez is in his deposition. When asked "[w]hy are you suing the City and Officer Jonathan Perez?" he responds that "[t]he man broke my finger and arrested me for something that I didn't do." (Dkt. No. 24-1 at 11:8–11.) But this general description of the lawsuit does not constitute evidence of identity.

17

opportunity to show Perez's picture to his client and, if Morris identified Perez as the officer who kicked him, have Morris sign an affidavit to that effect. Considering that the City does not otherwise dispute Morris's account of the unconstitutional use of force, the lack of an opposing affidavit—whether by oversight or strategic omission—dooms what might have been a meritorious claim.

In this respect, this case is similar to *Universal Calvary Church v. City of New York*, where the court granted summary judgment against a plaintiff alleging unconstitutional use of force, explaining that:

> Although the Court understands that, in a chaotic situation such as this one, it is difficult to observe and remember every detail, [Plaintiffs] have been through extensive discovery lasting several years. The Plaintiff attorneys have photographs of all of the named Defendants. In addition, many of the Plaintiffs . . . had the opportunity to identify the Defendants. [Plaintiff] has never identified any of the named Defendants, either by name, description, photograph, or witness testimony at any time in the course of this lawsuit. [Plaintiff] has not filed an opposing affidavit stating that he recognizes any of the named Defendants as an officer who used force against him. In the motion papers, [Plaintiff's] attorneys have failed to point to specific evidence that identifies any of the named Defendants as being involved in [Plaintiff's] arrest. . . . The best Plaintiffs offer with respect to some Defendants is a time at which they arrived[, but] mere presence at the site of a melee involving hundreds of people is not evidence of personal involvement for the purpose of holding individual defendants liable for constitutional violations. . . . Without any evidence linking any of the Defendants to the use of force in any way, this Court cannot allow the charge to go to trial when the Defendants are being held personally liable for constitutional violations.

No. 96 Civ. 4606, 2000 WL 1538019, at *18 (S.D.N.Y. Oct. 17, 2000).

The lack of an affirmative identification by Morris, combined with the meager evidence otherwise adduced, is fatal to Morris's use-of-force claim. *See Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (affirming summary judgment where the defendant officer "documented his

18

assertion of no personal involvement" in use-of-force incident and plaintiff "offer[ed] no concrete evidence to the contrary"). Accordingly, Perez is entitled to summary judgment as to Morris's use-of-force claims.

### D. Conspiracy, Municipal Liability, and Negligent Hiring

In their motion for summary judgment, Defendants argue in opposition to Morris's claims of § 1985 conspiracy, municipal liability, and negligent supervision and hiring. Morris does not respond to these arguments—or even mention them—in his opposition brief. "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014).

Given that Morris responded to some claims and chose to ignore others, the Court concludes that he has abandoned his claims of § 1985 conspiracy, municipal liability, and negligent supervision and hiring. *See Netherlands Ins. Co. v. Selective Ins. Co. of Am.*, No. 14 Civ. 7132, 2016 WL 866348, at *7 (S.D.N.Y. Mar. 3, 2016) (holding that claims were abandoned because "Plaintiff devoted a sizeable portion of its opening brief to [an issue], but Defendant—who is represented by counsel—declined to discuss [that issue] in its response"); s*ee also Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009).

### E. Common Law Assault

Morris's opposition brief asserts a claim against the City for common law assault based on a theory of *respondeat superior*. (Dkt. No. 32 at 12.) However, since none of Morris's federal claims survive summary judgment, the Court declines to exercise supplemental jurisdiction over Morris's state law claim. *See Mangum v. City of New York*, No. 15 Civ. 8810, 2016 WL 4619104, at *4 (S.D.N.Y. Sept. 2, 2016).

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 23 and to close this case.

SO ORDERED.

Dated: August 18, 2017
New York, New York

_____
J. PAUL OETKEN
United States District Judge